UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:15-cr-237 |
| | ) | |
| v. | ) | **BILL OF INFORMATION** |
| | ) | |
| | ) | Violations: |
| | ) | |
| | ) | 15 U.S.C. § 78j(b) |
| SWISHER HYGIENE INC. | ) | 15 U.S.C. § 78m |
| | ) | 15 U.S.C. § 78ff |
| | ) | 18 U.S.C. § 371 |
| | ) | |

THE UNITED STATES ATTORNEY CHARGES:

At the specified times and at all relevant times:

### Relevant Entities and Individuals

1. Swisher Hygiene Inc. ("Swisher" or the "Company") is a Delaware corporation with its headquarters and principal place of business in Charlotte, North Carolina. Swisher is a leading provider of hygiene and sanitation solutions throughout North America and internationally. Swisher is a publicly traded corporation, the Class A common stock of which has been listed since February 2, 2011 on the NASDAQ Stock Market LLC ("NASDAQ") under the ticker symbol "SWSH." Swisher's shareholders are located throughout the United States, including in the Western District of North Carolina.

2. Executive A, a co-conspirator not charged herein, was a Swisher senior executive and a member of its executive management team. Executive A's primary responsibilities included, among other things, directing, managing, and controlling the accounting and finance functions of the Company and preparing, filing, and certifying the Company's financial statements with the United States Securities and Exchange Commission ("SEC"). Following Swisher's internal investigation, as discussed below, Swisher terminated Executive A in May 2012.

3. Executive B, a co-conspirator not charged herein, was a certified public accountant and a senior executive in Swisher's accounting team. In this role, Executive B's responsibilities included, among other things, assisting with the accounting close process, providing technical advice and guidance in conformity with Generally Accepted Accounting Principles ("GAAP") to other accounting personnel, and preparing and coordinating the filing of financial statements with the SEC. Following Swisher's internal investigation, as discussed below, Swisher terminated Executive B in May 2012.

1

4. Employee C, a co-conspirator not charged herein, joined Swisher in 2011 as Director of Financial Planning and Analysis. Employee C held various positions while at Swisher and was a senior level employee in the accounting department. Following Swisher's internal investigation as discussed below, Swisher terminated Employee C in May 2012.

5. Employee D joined Swisher as Corporate Controller in July 2011. Employee D was a certified public accountant. In or about January 2012, Executive A directed Employee D to make fraudulent accounting entries in Swisher's books and records. Employee D refused, and Executive A then fired employee D.

6. Employee E, a co-conspirator not charged herein, joined Swisher in or about May 2011 as a Division Level CFO. Employee E was a certified public accountant.

7. Wells Fargo Bank, N.A. ("Wells Fargo") is a financial institution the deposits of which are insured by the FDIC. In or about March 2011, Swisher entered into a $100 million senior secured credit facility (hereinafter "Credit Facility") with Wells Fargo. In or about September 2011, Swisher sought additional money from Wells Fargo to conduct a large acquisition (hereinafter "Acquisition A"). Swisher was required to provide a variety of financial information to Wells Fargo in connection with securing money for both the Credit Facility and Acquisition A, as well as maintaining access to the Credit Facility.

## Requirements of Swisher as a Public Company

8. As a public company, Swisher is required to comply with the rules and regulations of the SEC. The SEC's rules and regulations are designed to protect members of the investing public by, among other things, ensuring that a company's financial information is accurately recorded and disclosed to the investing public.

9. As a public company, Swisher is required to file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) that included financial statements that accurately presented Swisher's financial condition and the results of its business operations in accordance with GAAP.

10. Under the SEC's rules and regulations, Swisher and its officers were also required to (a) make and keep books, records and accounts that, in reasonable detail, fairly and accurately reflect the Company's business transactions; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the Company's transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

11. As a public company, Swisher is also required to have an outside auditor conduct annual audits and quarterly reviews of the Company's financial statements. Swisher's outside auditor at all relevant times was BDO Seidman, LLP ("BDO").

12. As part of its financial reporting, Swisher also reported "Adjusted EBITDA" (Earnings Before Interest, Tax, Depreciation, and Amortization), as an additional metric by which to measure the Company's performance. In its public filings, Swisher defined Adjusted EBITDA as net loss excluding the impact of income taxes, depreciation and amortization

2

expense, interest expense and income, foreign currency gain, net gain/loss on debt related fair value measurements, stock based compensation, and third party costs directly related to mergers and acquisitions. According to its public filings, Swisher presented Adjusted EBITDA "because we consider it an important supplemental measure of our operating performance and believe it is frequently used by securities analysts, investors and other interested parties in the evaluation of our results."

13. Swisher was required to provide Wells Fargo financial statements that fairly presented its financial condition in order to maintain a credit facility and to obtain financing for an acquisition. Swisher also provided Adjusted EBITDA forecasts to Wells Fargo and other financial institutions. Thus, Adjusted EBITDA was an important measure utilized by Swisher to obtain from banks the money necessary to fund Swisher's business operations.

## Accounting Fraud Scheme

14. From in or about 2011 through in or about early 2012, Swisher and certain employees devised and carried out a scheme to defraud the investing public by materially misrepresenting Swisher's financial position, as reported in its Forms 10-Q and 10-K.

15. The purpose of the scheme was to ensure that Swisher consistently reported that its Adjusted EBITDA had met or exceeded executive management's forecasts and to conceal the existence of the fraud from, among others, BDO, Wells Fargo and the investing public.

16. Generally speaking, the accounting fraud scheme involved: (a) the creation of fraudulent accounting entries in multiple accounts of Swisher's corporate books and records, including those related to, among others, acquisition expenses, "bad debt" or allowance for doubtful accounts receivable, workers compensation reserves, and marketing expenses; and (b) the provision of false and/or misleading information to, among others, BDO, Wells Fargo, and the investing public.

17. When Adjusted EBITDA was falling short of the target, Swisher and its co-conspirators, used various methods to fraudulently manipulate the books and records in order to hit certain Adjusted EBITDA targets, including, for example:

    a. Taking expenses that were supposed to be booked to the Company's profit and loss statement and moving them to the balance sheet, fraudulently reducing expenses and thereby increasing income.

    b. When acquiring companies, inflating certain liabilities that were established for contingent earn-outs, and then fraudulently reducing those liabilities, resulting in increased income.

    c. Engaging in what is commonly referred to as "cookie jar" accounting, by inflating reserves during the process of acquiring other businesses and then fraudulently reducing those reserves and increasing income.

18. Regardless of the methodology, the accounting fraud scheme generally progressed as follows:

 a. As part of the closing process, accounting department personnel received emails that provided the Adjusted EBITDA target and a "hit list" of accounting entries that could be fraudulently adjusted to enable Swisher to hit the Adjusted EBITDA forecast.

 b. On the "hit list" and in other documents, certain co-conspirators referred to entries that had a positive effect on Adjusted EBITDA as "good guys" and to entries that had a negative effect on Adjusted EBITDA as "bad guys."

 c. Often, when a "bad guy" had to be made, certain co-conspirators searched for or directed others to search for a corresponding entry that would negate the "bad guy's" effect on Adjusted EBITDA.

 d. Generally, once the desired Adjusted EBITDA target was achieved, the results were communicated to accounting department personnel and Swisher's executive management and the closing process concluded. At year-end, however, certain co-conspirators took steps to build a "cushion" into the Adjusted EBITDA for use in the scheme later.

19. Swisher and its co-conspirators took numerous specific steps in furtherance of the accounting fraud scheme. For example, as part of the close of the books for the second quarter, which ended June 30, 2011, various co-conspirators engaged in the following overt acts:

 a. Prior to the close of the second quarter, on May 14, 2011, Executive A informed Swisher's CEO and others that the expected Adjusted EBITDA for the second quarter would be between $3 and $4 million.

 b. On July 23, 2011, as part of the second quarter closing process, Executive A informed Executive B, Employee C, and others that the Adjusted EBITDA for the second quarter, which had ended June 30, 2011, was "currently" at "$2.370 million" but that "based on what I see right now we can close at slightly above $3.0 million."

 c. On July 26, 2011, as part of the second quarter closing process, Executive A emailed Employee C, stating, "I need about $250k in income to get to $3MM."

 d. On July 26, 2011, Employee C responded that there were uncapitalized labor expenses in two accounts and that "those together may get you close."

 e. On July 26, 2011, Executive A then responded, stating "Let's work up the number. If we are short. We will get it in bad debt. Good work. Can we get it today?"

 f. On July 26, 2011, after booking that and other fraudulent entries, Executive A informed Swisher management that "June is closed" and that "Adjusted EBITDA is $3 million."

4

20. Through the above described conduct, Executive A, Executive B, and others fraudulently manipulated Swisher's books and records so that Swisher could hit the Adjusted EBITDA forecast of $3 million for the second quarter, thus rendering Swisher's 10-Q and the financial statements contained therein fraudulent and/or misleading.

21. In yet other examples, as part of the close of the books for the third quarter, which ended September 30, 2011, various co-conspirators engaged in the following overt acts:

   a. Approximately five days after the third quarter ended, on October 5, 2011, Executive A informed Wells Fargo that Swisher's Adjusted EBITDA forecast for the third quarter was $5.2 million.

   b. Approximately fourteen days after quarter end, at close of business on Friday, October 14, 2011, Executive A informed Swisher management that Swisher was currently "at an Adjusted EBITDA of $2.4 million against our forecast of $3.5 million [for the month of September]. I believe the Wells expectation is $2.8…[for the month of September]."

   c. On October 15, 2011, as part of the third quarter closing process, Executive A emailed Employee E, a division CFO, stating "Please call me as soon as possible. I need to talk to you about your Q3 numbers. I need you to go back and squeeze them for an additional $220k of EBITDA. I suspect you should have room in some of your reserves."

   d. On October 15, 2011, Employee E responded, stating "so we didn't want to touch it yet…but if we are at the 'rainy day' then maybe we take in now. Beside those 2 items…we scrubbed the hell out of our #'s this month hoping to get closer to budget. Overall I think I can take the $225 out of reserves…but I [sic] will leave me naked on reserves after this."

   e. On October 15, 2011, Executive A then responded, stating "Do your best to get $200k. We need to stretch a bit to get to the numbers in Q3. I think we all will be a bit bare. At the end of the day if we get to the number I will let some come back your way. Can I get a confirmation that you can do 200k today? Tell me where to book it by account up here and we will do it in consolidation."

   f. On October 15, 2011, Employee E responded with the figures and the account, stating "… the cupboard is pretty bare now."

   g. On October 15, 2011, Executive A forwarded the foregoing email exchange to Executive B, stating "Please book these entries in consolidation…"

   h. On October 15, 2011, Executive A emailed Executive B, Employee C, Employee D, and others in the accounting department, stating "It looks like we have gotten to our forecast number of $3.5 million for September. Congrats on the good work."

5

22. Through the above described conduct, Executive A, Executive B, Employee C, and others fraudulently manipulated Swisher's books and records so that Swisher could hit the Adjusted EBITDA forecast of $5.2 million for the third quarter, which had previously been provided to Wells Fargo, thus rendering Swisher's 10-Q and the financial statements contained therein fraudulent and/or misleading.

23. In further examples, as part of the close of the books for the fourth quarter, which ended December 31, 2011, various co-conspirators engaged in the following overt acts:

   a. On January 21, 2012, as part of the fourth quarter closing process, Executive A emailed accounting department employees, stating: "We are still short of the target... I thought we were there yesterday. We will get to $5.4 million. What are the options to find the remaining $131K?"

   b. On January 21, 2012, Executive B responded to Employee C, stating "Is the Hawaii Enviro earnout still booked as a liability? Do we need it?"

   c. On January 21, 2012, Employee C replied to Executive B and copied Executive A, stating: "Yes it's still there. [Executive A] does not want to use it."

   d. On January 28, 2012, after reaching the target of $5.4 million, Executive A emailed members of the accounting department concerning the Adjusted EBITDA target, stating "Great job guys. It is a bit higher than I thought we would get to. Let's freeze it here.

24. As a result of the scheme, Swisher filed fraudulent and misleading Forms 10-Q and 8-K for the second and third quarters of 2011. Swisher attempted to do the same with regard to its 2011 Form 10-K, prior to the accounting fraud conspiracy being uncovered.

### The Accounting Fraud Scheme Is Uncovered

25. In or about January 2012, as part of the year-end closing process, Executive A directed Employee D to make a fraudulent accounting entry for the purpose of hitting the Adjusted EBITDA forecast. Employee D repeatedly objected to making the fraudulent accounting entry but each time was again pressured by Executive A to make the fraudulent entry.

26. After Employee D informed Executive A that he intended to seek the advice of BDO concerning the entry, Executive A fired Employee D. Executive A then caused the fraudulent entry to be booked following Employee D's termination, thereby enabling Swisher to fraudulently hit the Adjusted EBITDA forecast.

27. Executive A misrepresented to the Audit Committee Chairman, to BDO, and to others that Employee D was fired principally because he was failing at his job. Executive A failed to inform the Audit Committee Chairman and BDO that he fired Employee D in the midst of the year-end close of the books process only after Employee D refused to make the fraudulent entry in Swisher's books and records.

28. Executive A's misrepresentations concerning the reasons for Employee D's termination caused BDO to delay speaking to Employee D for several weeks. On the evening of February 22, 2012 Employee D was finally interviewed by representatives from BDO and Swisher's general counsel. During the interview, Employee D reported the existence of the fraudulent scheme. This was the first time BDO learned the true nature of Employee D's allegations.

29. The following day, February 23, 2012, Employee D's statements with regard to the fraudulent scheme were conveyed to Swisher's Audit Committee, which then commissioned an investigation concerning Employee D's accounting fraud allegations (hereinafter "Audit Committee Investigation").

30. On or about March 28, 2012, Swisher publicly announced that the Audit Committee was conducting an investigation "regarding a former employee's concerns with certain of the Company's accounting policies." The Company also announced that, among other things, its financial statements for the first three quarters of 2011 in the Company's quarterly reports should no longer be relied upon and that these financial statements may need to be restated. Finally, Swisher announced that it would be delayed in filing its Form 10-K for the 2011 year.

31. During the Audit Committee Investigation, Executive A, Executive B and Employee C provided investigators false and/or misleading information in an effort to cover up the accounting fraud scheme and obstruct the Audit Committee Investigation.

32. In February 2013, approximately 11 months following the announcement of the Audit Committee investigation, Swisher filed restated financial reports for the first three quarters of 2011 ("Restatement") and filed its Form 10-K for the 2011 year. The Restatement reflected, among other things, that Swisher had substantially overstated its Adjusted EBITDA and significantly understated its net loss during the relevant time period.

7

## COUNT ONE

## 18 U.S.C. § 371
### (Conspiracy)

33. The factual allegations in paragraphs 1 through 32 of this Bill of Information are incorporated by reference and re-alleged as though set forth herein.

34. From at least in or about 2011 through in or about 2012, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### SWISHER HYGIENE INC.

Executive A, Executive B, and Employee C and others known and unknown to the United States Attorney did knowingly and intentionally combine, conspire, confederate and agree:

    a. To commit securities fraud in violation of Title 15 U.S.C. §§ 78j(b) and 78ff, and Title 17 C.F.R. § 240.10b-5;

    b. To make and cause to be made false and misleading statements to Swisher's auditors and accountants, in violation of Title 15 U.S.C. § 78ff, and Title 17 C.F.R. § 240.13b2-2;

    c. To falsify books, records and accounts of Swisher, in violation of Title 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17 C.F.R. § 240.13b2-1.

### Objects of the Conspiracy

35. It was a part and an object of the conspiracy that the defendant and others known and unknown to the United States Attorney, willfully, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, would and did use and employ manipulative and deceptive devices and contrivances in connection with the sale of Swisher securities by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, in violation of Title 15 U.S.C. §§ 78j(b) and 78ff, and Title 17 C.F.R. § 240.10b-5.

36. It was a part and an object of the conspiracy that the defendant and others known and unknown to the United States Attorney, would and did willfully, directly and indirectly, make and cause to be made materially false and misleading statements to an accountant and omit to state and cause another person to omit to state to an accountant any material fact necessary in order to make the statement made, in light of the circumstances under which such statements were made, not misleading, in connection with the preparation and filing of a document and report required to be filed with the SEC pursuant to Subpart A of the Securities and Exchange Act of 1934, in violation of Title 15 U.S.C. § 78ff, and Title 17 C.F.R. § 240.13b2-2.

37. It was a part and an object of the conspiracy that the defendant and others known and unknown to the United States Attorney, would and did willfully and knowingly falsify the books, records, and accounts of Swisher, an issuer of securities registered pursuant to Title 15 U.S.C. § 78l, in violation of of Title 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17 C.F.R. § 240.13b2-1.

## Manner and Means

38. Swisher and/or others known and unknown to the United States Attorney carried out the conspiracy in the manner and means as set forth in paragraphs 1 through 32 above.

## Overt Acts

39. In furtherance of the conspiracy, and to accomplish the objects thereof, Swisher and its co-conspirators committed one or more of the overt acts set forth in paragraphs 1 through 32 above, among others, in the Western District of North Carolina and elsewhere.

All in violation of 18 U.S.C. § 371.

JILL WESTMORELAND ROSE
ACTING UNITED STATES ATTORNEY

*[signature]*
MARK T. ODULIO
ASSISTANT UNITED STATES ATTORNEY

*[signature]*
MARIA K. VENTO
ASSISTANT UNITED STATES ATTORNEY

9